## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

ASHLEY DIXON,

     *Plaintiff*

   v.

OFFICER LEANDER DELICIEUX,
OFFICER MATTHEW ABAD,
and
the CITY OF ATLANTA,

     *Defendants*

**CIVIL ACTION
NO. 1:22-cv-02209-SEG
JURY TRIAL DEMANDED**

## THIRD AMENDED COMPLAINT

## PRELIMINARY STATEMENT

This is a civil rights action brought under 42 U.S.C. § 1983 against Defendants, the City of Atlanta, and individual Atlanta Police Department (APD) officers, concerning their unlawful use of excessive force and unlawful arrest of Ms. Ashley Dixon on June 2, 2020.

Like thousands of conscientious citizens and residents throughout the country and world, Ms. Dixon attended a lawful protest against police brutality in the aftermath of the horrific murder of George Floyd by a police officer in

1

Minnesota. Defendants responded by preventing Ms. Dixon and other demonstrators from leaving the area and subjecting them to large amounts of tear gas, before arresting Ms. Dixon and others. The arrests took place pursuant to the enactment of a city-wide 9PM curfew, which Ms. Dixon was charged with violating. But Ms. Dixon was forced to disperse and arrested before 9PM, or, in the alternative, arrested after 9PM only because she was prevented from complying in a timely manner. During the course of her arrest, one of the Defendants pointed a gun at Ms. Dixon despite her compliance and the lack of a threat she posed to any person.

Ms. Dixon was unlawfully detained for roughly fifteen hours after her arrest, during which time she was unable to protect herself from the COVID-19 pandemic, then at its height, because Defendants' detention prevented her from socially distancing or wearing a mask. Ms. Dixon's sole charge of violating the curfew was dismissed for "evidentiary reasons" several months later.

As a result of experiencing Defendants' excessive use of force and unlawful arrest, Ms. Dixon has suffered medical harms, emotional trauma, and a chill on her exercise of protected speech. Defendants are liable for damages to Ms. Dixon and for injunctive relief for future compliance with the law.

## JURISDICTION & VENUE

1.    This Court has jurisdiction over the subject matter of the complaint under 42 U.S.C. § 1983.

2.    Venue is proper where a substantial portion of the events giving rise to this suit took place within this district and where, on information and belief, Defendants reside in this district.

## PARTIES

*Plaintiff*

3.    Plaintiff Ashley Dixon is a resident of Dekalb County, Georgia. A former corrections officer, Ms. Dixon was troubled by abuses she witnessed on the job, prompting her to begin speaking out in public fora, including state legislatures, about the need for law enforcement reform. Ms. Dixon left her career in law enforcement as a result of witnessing these abuses and began pursuing a career in civil rights and anti-discrimination work. Ms. Dixon attended a demonstration on June 2, 2020 out of her ongoing support for efforts to change abusive and discriminatory policing practices.

*Defendants*

4.      Defendant Officer Leander Delicieux[1] is or was, at all times relevant, an officer of the Atlanta Police Department who aimed a firearm at Ms. Dixon during her efforts to comply with police orders to disperse from a protest.

5.      Defendant Matthew Abad[2] is or was, at all times relevant, an officer of the Atlanta Police Department who arrested Ms. Dixon.

6.      All individual officer Defendants acted in concert and conspiracy, were jointly and severally liable, and, at all relevant times, acted under color of state law. They are sued in their individual capacities.

7.      Defendant City of Atlanta is a municipality created under the laws of the State of Georgia. At all times relevant, remaining Defendants were employed by Defendant City of Atlanta.

## **FACTUAL ALLEGATIONS**

*City officials impose a curfew*

8.      On Friday, May 29, 2020, over one thousand demonstrators descended on downtown Atlanta for a mass demonstration.

---

[1]    This officer was previously identified as John Doe 1. Plaintiff identifies this Defendant by name pursuant to Defendants City of Atlanta's disclosures in response to Plaintiff's First Expedited Interrogatories. Pursuant to those same disclosures, this Defendant's name was previously misspelled as "Deslicieux".

[2]    This officer was previously identified as John Doe 2. Plaintiff identifies this officer by name pursuant to Defendant City of Atlanta's disclosures in response to Plaintiff's First Expedited Interrogatories.

9.    The protest was one of hundreds of demonstrations that took place
      throughout the country and the world, primarily over the May 25, 2020
      police murder of George Floyd in Minneapolis, other high-profile incidents
      of police violence against Black people, and widespread discontent about
      police violence, discrimination, and inequality.

10.   Then City of Atlanta Police Chief Erika Shields attended the demonstration
      to address the crowd.

11.   During that address, Shields repeatedly expressed that she shared the
      crowd's concerns.

12.   In particular, Shields indicated her opposition to using tear gas. When a
      demonstrator asked "Are police going to use tear gas today?", Defendant
      Shields responded "We're not looking to use tear gas. My ass wouldn't be
      standing here if we were looking to use tear gas. I'm here to hear you." See
      Josh Wood, "Who is the real Erika Shields?" Louisville Magazine, available
      at https://louisville.com/erika-shields-lmpd-louisville-police-chief.

13.   But based on events that took place later that evening, including acts of
      vandalism and looting, Defendant Shields changed her tone.

14.    During a press conference the next day, May 30, 2020, Defendant Shields

and Keisha Lance Bottoms, then mayor of Defendant City of Atlanta,

announced the imposition of a curfew.

15.    Mayor Bottoms stated, "So we can figure out and sort out who cares about

peaceful change in this city and who is here to destroy our city, I am taking

the very unusual and extreme step of instituting a curfew in our city this

evening from 9PM to sunrise." See, "Full Briefing with Mayor Bottoms and

Chief Shields," FOX 5 Atlanta (May 30, 2020), available at

https://www.fox5atlanta.com/video/689668.

16.    She continued, "Please know where your children are this evening. We do

not want to have to arrest your children. We do not want to have to detain

anyone. But we will maintain order." Id.

17.    Chief Shields continued, after about two to three hours, she believed it was

clear that "there were people within the protest who were not here to protest.

They were here to destroy Atlanta. [Their] behavior was not to make a

position statement. It was one of extreme violence." Id.

18.    Defendant Shields used inflammatory language to summarize the threat

posed by potential property destruction, arguing that the alleged lawbreaking

elements among the protesters were "a highly calculated terrorist

organization...when you come in and your goal is to inflict harm, property

damage...you are a terrorist." <u>Id</u>.

19.   She concluded with "Quite frankly, I'm ready to just lock people up." <u>Id</u>. 24.

20.   Discussing the curfew specifically, Chief Shields stated "The curfew is

useful for us for a simple reason: we have a lot of folks who are out just

lingering and mingling, and it creates high numbers of individuals and it

makes it difficult for us to distinguish who just wants to film the events of

the evening, who just wants to protest, and who wants to throw knives and

shoot guns at innocent people….the curfew allows us to say 'Please, just go

in, and let us deal with the people who are here with ill-intent.' And I'm so

grateful for the curfew for that reason, that it allows us to focus on the

problem." <u>Id</u>.

21.   At 5:17PM of the same day, May 30, 2020, Mayor Bottoms signed and

decreed Executive Order Number 2020-92, an executive order signed

pursuant to § 2-181(a) of the Code of the City of Atlanta (herein "the Curfew

Order") declaring a state of emergency to exist within Atlanta and imposing

a curfew that "shall begin at 9:00pm and shall end at sunrise."

22.    The Curfew Order, among other things, exercised the Mayor's emergency powers to "close streets and sidewalks" and to "close business establishments" in Atlanta. Id. at Section 3.

23.    The Curfew Order was extended by Executive Order Number 2020-94, which was in effect on June 2, 2020.

*Ms. Dixon attends and tries to leave a lawful demonstration*

24.    On June 2, 2020, Ms. Dixon went to downtown Atlanta to attend one of the ongoing demonstrations against police brutality, discussed supra, ¶9.

25.    The demonstration included a march through the streets of downtown Atlanta.

26.    The demonstration was lawful and peaceful.

27.    Prior to 9PM, Ms. Dixon and other demonstrators had made their way to the intersection of Marietta St. and Centennial Olympic Parkway, where hundreds of riot police officers affiliated with the APD were stationed.

28.    Ms. Dixon and other demonstrators tried to disperse due to the presence of increasingly aggressive riot police.

29.    The officers began charging forward at Ms. Dixon and other demonstrators.

30.    The officers declared on a P.A. system that the demonstration was unlawful and that a curfew had been imposed.

31.    The charging forward of officers and announcement regarding the curfew were issued before 9PM.

32.    Ms. Dixon could not leave because police officers had blocked all apparent exit routes.

33.    The police had blocked all apparent exit routes in formation by organizing themselves in police cordons, rather than acting spontaneously.

34.    On information and belief, APD officers were acting pursuant to orders, which explains the organized process through which they were blocking exit routes despite the impending curfew.

*Police Officers use tear gas despite the lack of exit routes*

35.    The riot police began firing tear gas at demonstrators, including Ms. Dixon, well before 9PM.

36.    Video captured by journalists from 11 Alive News indicates that police began arresting and tear gassing demonstrators, including Ms. Dixon, as early as 8:49PM despite the demonstration being peaceful. 11Alive Staff, "Social unrest, demonstrations across metro-Atlanta on June 2," 11 Alive News (June 2, 2020), available at

https://www.11alive.com/article/news/local/protests/atlanta-protests-day-five/85-61e29b89-11c2-4e5c-885e-b748a99b4d64 (article and footage of

police blocking entrances and firing tear gas at crowds, including journalists, as early as 8:49PM, prompting individuals to climb over construction equipment to disperse and along with commentary from the reporters indicating that no criminal activity was taking place; Ms. Dixon is visible in this footage holding a water bottle and attempting to comply at 0:45-0:50).

37.    Tear gas is a chemical agent used to disperse crowds.

38.    Tear gas is deployed in a canister that can be launched at crowds as a projectile.

39.    Tear gas exposure is extremely painful, as tear gas triggers pain receptors in the eyes, nose, and throat. Sarah Kliff, "Tear gas is banned in international warfare – but reportedly in use in Ferguson, MO" Vox (Nov. 24, 2014), available at https://www.vox.com/2014/8/14/6001995/ferguson-missouri-tear-gas-painful (interview with a scientific expert on tear gas).

40.    Immediate exposure to tear gas causes excessive tearing and burning of the eyes and blurred vision; burning and swelling of the nose; burning and irritation to the mouth; tightness to the chest; a choking sensation and shortness of breath; burns and rash to the skin; and other symptoms. Centers for Disease Control, "Facts about Riot Control Agents," available at (https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp).

41.    Exposure to a large dose of tear gas, especially in a closed setting, may cause severe effects such as blindness, glaucoma, or even death due to chemical burns to the throat and lungs or respiratory failure. Id.

42.    Long term effects of tear gas include eye problems and breathing problems. Id.

43.    Tear gas causes abnormal menstrual cycles.

44.    A study in BMC Public Health reports that a significant number of individuals exposed to tear gas experienced abnormal menstrual cycles. Heather Murphy, "Hundreds Reported Abnormal Menstruation After Exposure to Tear Gas, Study Finds," New York Times (May 1, 2021), available at https://www.nytimes.com/2021/05/01/us/period-tear-gas-study-portland.html.

45.    Ms. Dixon was exposed to the tear gas, causing her significant pain, blurring her vision, preventing her from opening her eyes properly, disorienting her, and causing her difficulty breathing.

46.    Ms. Dixon attempted to run northeast on Centennial Olympic Parkway in a panicked attempt to disperse and avoid arrest, despite the time being well before 9PM and despite suffering from the effects of tear gas.

47.     Ms. Dixon could only run roughly one block before being blocked in again
        by police cordons.

48.     Ms. Dixon attempted to leave by exiting through a construction site located
        at or near 155 Centennial Olympic Parkway.

49.     Even upon exiting the area and attempting to leave through a construction
        site, Ms. Dixon was exposed to tear gas and remained in pain.

*Officer points a firearm at Ms. Dixon*

50.     Defendant Delicieux followed Ms. Dixon and several other demonstrators
        who were with her into the construction site.

51.     Defendant Delicieux unholstered a firearm and pointed his weapon at Ms.
        Dixon and the other demonstrators.

52.     Ms. Dixon and the other demonstrators begged Defendant Delicieux not to
        shoot them.

53.     At all times, Ms. Dixon and all others present were compliant and no
        circumstances existed for the lawful use or threatened use of an officer's
        firearm.

54.     At gunpoint, Ms. Dixon was forced out of the construction site.

55.     Defendant Delicieux told Ms. Dixon that she would not be arrested if she
        left the construction site.

56.    Upon leaving the construction site, Ms. Dixon was still exposed to tear gas.

*Arrest, Detention, and Subsequent Prosecution*

57.    Upon exiting the construction site, Ms. Dixon was nonetheless arrested by both Defendants Delicieux and Abad.

58.    On information and belief, Ms. Dixon's arrest took place before 9PM.

59.    Regardless, Ms. Dixon was arrested only after being prevented from dispersing prior to 9PM.

60.    Ms. Dixon was marched, with other arrestees, to a makeshift detention location at an unknown address.

61.    Ms. Dixon was then loaded into a police van, where she was held for roughly one hour.

62.    Ms. Dixon was then driven to the Atlanta Detention Center, where she was held over night for an estimated fifteen hours.

63.    While in custody, Ms. Dixon was prevented from socially distancing from other prisoners and was deprived of a mask, despite the arrest taking place at the height of the COVID-19 pandemic.

64.    Ms. Dixon was released with a citation for curfew violation.

65.    During her criminal prosecution, no arrest reports or incident reports were produced.

66.     On information and belief, these reports were never provided to the Solicitor's Office.

67.     Despite the lack of any evidentiary reports of any kind, Ms. Dixon was subject to prosecution for over six months.

68.     On January 15, 2021, Ms. Dixon's sole charge was dismissed for "evidentiary reasons." See Exhibit A.

*Subsequent Medical Issues and Other Damages*

69.     After her release from custody, Ms. Dixon continued to experience pain, suffering, and irritation in her eyes for over one month.

70.     During that time, Ms. Dixon could not work or function properly due to the effect on her vision.

71.     For roughly six months after her arrest, Ms. Dixon experienced irregular menstrual cycles, including abnormally bleeding in greater amounts and for weeks at a time, and with more painful cramping.

72.     Ms. Dixon visited a gynecologist for this issue, which dissipated only after six months.

73.     Ms. Dixon also underwent a painful cervical biopsy to confirm that she had not developed cancer.

74.     Ms. Dixon began experiencing abnormal tonsil issues after her arrest.

75.  A doctor indicated to Ms. Dixon that her tonsil issues were abnormal.

76.  Ms. Dixon's eye and menstrual symptoms are consistent with exposure to tear gas.

77.  On information and belief, Ms. Dixon's tonsil issues, taking place at roughly the same time as her other symptoms, is the result of excessive exposure to tear gas.

78.  Ms. Dixon experienced abnormal symptoms of menstruation including excessive and unexpected bleeding and serious and abnormally painful cramps and sharp pains.

79.  Ms. Dixon also suffered emotional damages as a result of her ordeal.

80.  Ms. Dixon experienced anxiety and depression both about the way she was treated, the trauma of being held at gunpoint, and the generally disturbing and discouraging character of the night's events with regard to Ms. Dixon's longstanding efforts to reform policing.

81.  Ms. Dixon experiences recurring nightmares about her arrest.

82.  Ms. Dixon remains anxious about the possibility of long-term effects to her reproductive health as a result of the effects of tear gas.

83.  In addition, Ms. Dixon experiences significant anxiety, including an increased heart rate, breathlessness, and nervousness when in downtown

Atlanta, forcing Ms. Dixon to pick between normal travel and life in Atlanta and avoiding anxiety.

84.     As a result of the traumatizing event, Ms. Dixon has been compelled to avoid activities that she normally enjoys, such as loud concerts and haunted houses, because of the presence of fog, smoke, or loud noises that trigger flashbacks to her arrest.

85.     Ms. Dixon also became reticent to attend protests as a result of her arrest and the chilling effect it created.

*Curfew-Related Events Pertaining to Ms. Dixon's Ordeal*

86.     During the days leading up to, including, and after Ms. Dixon's arrest, Atlanta residents remained confused about the scope of the application of the Curfew Order because of the City's enforcement. See, e.g. Stell Simonton, "A week of curfews in Atlanta creates plenty of confusion," Atlanta Magazine (June 8, 2020) available at https://www.atlantamagazine.com/news%02culture-articles/a-week-of-curfews-in-atlanta-creates-plenty-of-confusion/

87.     Witness statements and media reports indicate that the City of Atlanta, far from enforcing the letter of the curfew, had a custom of permitting or

ordering officers to clear out lawful protests at any time *before* the designated curfew time.

88. Officers did so through the use of tear gas and other violent crowd control methods, and by arresting residents without probable cause, often with unnecessary uses of force.

*Messiah Young and Tanya Pilgrim*

89. On May 30, soon after the imposition of the Curfew Order, two Black college students, Messiah Young and Tanya Pilgrim, were pulled out of their vehicle in downtown Atlanta and arrested by Atlanta police officers pursuant to enforcement of the curfew.

90. Video footage of the brutal arrest went viral and prompted outrage.

91. Police Chief Erika Shields immediately fired two officers involved in the arrest and placed others on desk duty and apologized to the arrestees.

92. Mayor Bottoms personally intervened to ensure that all charges against the arrested students were dropped and apologized to the students.

93. Mayor Bottoms intimated that the arrests and subsequent firings were examples of the City of Atlanta's attitude of reform against police misconduct.

94.    The Fulton County District Attorney filed criminal charges against two officers involved in the arrest.

*Raulston Tiger Li*

95.    Raulston Tiger Li was present at a demonstration near the CNN building on May 30.

96.    Mr. Li indicates that the protest was peaceful and there was no indication that demonstrators were engaged in any unlawful activity of the sort described by City officials the prior day.

97.    At roughly 7PM – two hours before the advertised curfew – Mr. Li witnessed the police begin clearing out the crowd by initiating arrests of anyone gathered at the demonstration.

98.    Mr. Li and at least ten other individuals were suddenly grabbed and arrested by APD officers.

99.    The arresting officers' conduct was violent and intimidating, and resulted in lacerations to Mr. Li's face.

100.    Shortly afterward, Mr. Li was placed with the other arrestees on a bus to be taken into a detention center.

101. Mr. Li personally heard APD officers indicating to each other that they were not sure what to charge the arrestees with, and were "shopping" for potential charges that would result in the lengthiest detention.

102. Mr. Li and all those who were arrested with him were charged with disorderly conduct with violence.

103. Mr. Li's charges were subsequently dropped.

*Asia Parks & Megan Harrison*

104. Ms. Asia Parks attended demonstrations on May 30, May 31, and June 1 as a legal observer monitoring police responses to protest activity on behalf of the National Lawyers Guild.

105. Ms. Parks indicated that she witnessed individuals engaged in peaceful demonstrations being arrested and teargassed prior to curfew time without any apparent justification on all three days.

106. On June 1, Ms. Parks was arrested herself.

107. Ms. Parks indicates that she was arrested minutes before 9PM on June 1.

108. Ms. Parks was arrested alongside another legal observer, Megan Harrison, at the same time, as well as several other demonstrators who were engaged in otherwise lawful assembly.

109.   Despite being arrested prior to 9PM, Ms. Parks was charged with violating the curfew and with no other charges.

110.   These charges were ultimately dropped.

111.   Ms. Parks and Ms. Harrison refrained from further attendance to monitor demonstrations as a result of this experience.

*Beverley Thompson et. al.*

112.   Also on June 1, Ms. Beverley Thompson, a medical practitioner who was present to render first aid to anyone who needed it, was present at a gathering of demonstrators near the Capitol Building in downtown Atlanta.

113.   She received an SMS message from the City at roughly 7:45PM indicating that the curfew would be enforced at 9PM.

114.   Shortly after receiving the text message, however, she heard APD officers screaming profanities and demanding the demonstrators leave.

115.   Without any further warning, APD officers began firing tear gas and rubber bullets at the crowd.

116.   No apparent reason existed for clearing out the crowd, as the demonstrators remained peaceful and no unlawful conduct was taking place.

117. Tom Slusher, Mohana Kute, and Emily Nawalsky, who were also present near the Capitol building, indicate that they were also witnessed the use of tear gas, flash bangs, and rubber bullets at or shortly after 7:45PM.

118. Ms. Thomspon personally witnessed individuals being arrested.

119. All four individuals indicate that despite suddenly being forced to flee, multiple exit routes were blocked off, hindering their escape.

120. Ms. Thompson reported health side effects similar to Plaintiff as a result of the excessive use of tear gas on this date.

*William Thomas and Rachel Fallon*

121. Mr. William Thomas and Ms. Rachel Fallon attended demonstrations in downtown Atlanta throughout the week.

122. The pair were both present near the CNN building and Centennial Park on all days that they attended demonstrations.

123. On May 30, May 31, June 1 and June 2, Mr. Thomas and Ms. Fallon personally witnessed the APD suddenly begin closing off exit routes and tear gassing the crowd without any apparent justification.

124. They report that each time, this happened roughly ten minutes prior to the 9PM curfew.

125.   Mr. Thomas and Ms. Fallon were both arrested on June 2 and charged with curfew violation, even though it was not yet 9PM.

126.   Both indicate that they were arrested alongside other demonstrators for the same apparent reason at the same time.

127.   Mr. Thomas estimates that his arrest took place at 8:55PM.

128.   Ms. Fallon estimates that her arrest took place at 8:50PM.

129.   Both made attempts to disperse from the area in advance of the curfew but were prevented from doing so and arrested.

130.   Both of their charges were ultimately dropped.

131.   Ms. Fallon returned to the demonstrations on June 4 and reported similar efforts to clear the crowd using tear gas and flash bangs prior to the designated curfew time.

*Dylan Vittorio*

132.   Dylan Vittorio attended the demonstrations on June 3, taking part in a procession from downtown Atlanta to Piedmont Park in midtown Atlanta and back.

133.   Mr. Vittorio was arrested and charged with curfew violation.

134.   Mr. Vittorio indicates that he and those who were with him were arrested shortly after 9PM.

22

135.    However, Mr. Vittorio also indicates that he and those in his group were unable to comply with the curfew because police officers had blocked all exit routes, rendering attempts to comply futile.

136.    Mr. Vittorio estimates that roughly two dozen people were trapped and arrested along with him.

137.    Mr. Vittorio reports the use of "overwhelming force" during the arrest, with arresting officers vastly outnumbering those arrested.

138.    Officers tackled arrestees to the ground.

139.    Mr. Vittorio's charges were ultimately dropped.

*Amy Ian Hardemon*

140.    Ms. Amy Ian Hardemon attended demonstrations throughout the week.

141.    On June 4, Ms. Hardemon witnessed police begin using tear gas and rubber bullets to clear out a demonstration downtown near the CNN center.

142.    No apparent reason existed for the sudden escalation.

143.    This took place at roughly 8PM.

144.    Ms. Hardemon attended a demonstration the following day and witnessed the police suddenly clearing out a demonstration at roughly 7PM using tear gas and rubber bullets.

145.    On both occasions, the demonstrations remained peaceful and no apparent

reason existed for clearing out the crowd.

*Kalpin Shah*

146.    Attorneys dispatched to support the numerous individuals who were arrested

during this period indicated that they witnessed a pattern of arrests taking place

during the time leading up to the curfew.

147.    In an interview, attorney Kalpin Shah, indicated that a consistent pattern was

the arrest of individuals in the minutes leading up to the 9PM curfew: "Right about

9 p.m., when they're walking to their cars, they're getting arrested." See Simonton,

supra at ¶ 86.

## CLAIMS FOR RELIEF

### COUNT I
**Excessive Force**
**U.S. Const. Amends. IV and XIV and 42. U.S.C. § 1983**
**Against Defendants Delicieux and the City of Atlanta**

148.    Defendants had a federal and constitutional duty barring them from using

excessive force against Ms. Dixon.

149.    Ms. Dixon was engaged in lawful, protected speech when she was blocked

from leaving the area of a demonstration and subject to tear gas.

150.  The use of tear gas against Ms. Dixon in conjunction with preventing her from leaving the area was objectively unreasonable and unnecessary given the totality of the circumstances, and constituted excessive force.

151.  Defendant City of Atlanta has a duty not to adopt or enforce a municipal custom that is unconstitutional and violates a person's rights, including permitting officers and supervisors of the Atlanta Police Department to use excessive force.

152.  The repeated misuse and excessive use of tear gas by the Atlanta Police Department against demonstrators who were engaged in lawful protected activities and could not leave despite attempts to disperse indicates such a custom.

153.  Similarly, the use of rubber bullets and physical tackling to arrest individuals in the effort to clear out crowds indicates that the City had such a custom.

154.  Defendant City of Atlanta is therefore liable for damages and/or injunctive relief.

155.  Threatening to shoot someone with a firearm when they have surrendered and pose no threat is objectively unreasonable and unnecessary and constitutes an excessive use of force.

156.   Defendant Delicieux's conduct in pointing his firearm at Ms. Dixon was an

excessive use of force, and Defendant Delicieux is liable for damages to Ms.

Dixon as a result.

### COUNT II
**False Arrest and Retaliatory Arrest**
**U.S. Const. Amends. I, IV and XIV and 42. U.S.C. § 1983**
**Against All Defendants**

157.   Defendants Delicieux and Abad had a duty not to arrest Ms. Dixon without

probable cause (false arrest), and a further duty not to arrest her in retaliation

for exercising a First Amendment-protected right (retaliatory arrest).

158.   Defendants had no probable cause to arrest Ms. Dixon where they knew it

was not yet 9PM when she was forced to disperse, where she had been

prevented from dispersing, where Ms. Dixon was attempting to comply with

the curfew order, where her arrest took place before 9PM, and/or where her

arrest took place after 9PM only as a result of being prevented from

complying with the curfew order.

159.   Furthermore, where there existed no probable cause to arrest Ms. Dixon and

she was arrested while attending and dispersing from a lawful protest, the

arrest constituted retaliatory arrest.

160.   Defendants Delicieux and Abad are therefore liable for the resulting

damages to Ms. Dixon.

161.   Defendant City of Atlanta has a duty not to adopt or enforce a municipal custom that is unconstitutional and violates a person's rights, including permitting officers and supervisors of the Atlanta Police Department to arrest residents without probable cause and/or in retaliation for engaging in demonstration.

162.   The City of Atlanta's repeated use of arrests to clear out lawful assemblies of on multiple days throughout the week outside of the time designated by the curfew order and/or upon preventing individuals from complying with the order indicates such a custom.

163.   Additionally, statements by city officials leading up to the imposition of the Curfew Order indicated a desire by Defendant City of Atlanta to use the state's police power to punish First Amendment-protected speech.

164.   Defendant City of Atlanta's promulgation and enforcement of a custom to arrest demonstrators without probable creates municipal liability for the City of Atlanta for the false and retaliatory arrest of demonstrators, including Ms. Dixon, and Defendant City of Atlanta is liable for the resulting damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Dixon respectfully requests:

1.   A trial by jury;

2.  Compensatory Damages as to all Defendants;

3.  Punitive Damages as to Defendants Delicieux, Abad, and Shields;

4.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise permitted by law;

5.  Declaratory and Injunctive Relief from this Court to direct Defendant City of Atlanta to comply with its obligations under the Georgia Open Records Act;

6.  Injunctive Relief requiring Defendant City of Atlanta to enact or amend its customs and policies to prevent the unlawful of tear gas;

7.  Any additional relief that this Court deems just and proper.

Respectfully submitted this 18th Day of November, 2024.

/s/ Amith Gupta
Amith Gupta, Esq.
GA Bar No. 149222
American Trial Law Litigators, LLC
925B Peachtree St. NE, #2151
Atlanta, GA 30309
Tel: (408) 355-5782
amithrgupta+law@gmail.com
